**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SHERYL LYNN MILLER,

      Plaintiff,                            Case No. 09-13665

v.                                    Hon. Gerald E. Rosen

CVS PHARMACY, INC.,

      Defendant.

_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on        March 14, 2011       

PRESENT:  Honorable Gerald E. Rosen
               Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Sheryl Lynn Miller commenced this suit in a Michigan court on July 28, 2009, alleging that her former employer, Defendant CVS Pharmacy, Inc., discriminated and retaliated against her in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 *et seq.,* and also asserting common-law tort claims of fraud and false imprisonment against her former employer.  Defendant removed the case to this Court on September 16, 2009, citing diversity of citizenship among the parties.  *See* 28 U.S.C. §§ 1441(a), 1332(a).

By motion filed on April 30, 2010, Defendant now seeks summary judgment in its favor on each of the claims asserted in Plaintiff's complaint. In particular, Defendant contends (i) that the "reasonable reliance" element of Plaintiff's fraud claim is defeated by language in a document signed by Plaintiff that contradicts the allegedly false statements made by Defendant's representatives; (ii) that the record fails as a matter of law to establish the elements of Plaintiff's claim of false imprisonment; and (iii) that Plaintiff has failed to establish one or more elements of a *prima facie* case of discrimination or retaliatory discharge. Plaintiff filed a response in opposition to this motion on May 20, 2010, arguing — largely without citation to the record — that she has identified a sufficient evidentiary basis for each of her claims to withstand summary judgment. Defendant then filed a June 3, 2010 reply in further support of its motion.

Having reviewed the parties' briefs in support of and opposition to Defendant's motion, as well as their accompanying exhibits and the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendant's motion "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. For the reasons set forth below, the Court finds that this motion should be granted.

## II.  <u>FACTUAL BACKGROUND</u>

Plaintiff Sheryl Lynn Miller, a Caucasian female, initially was employed by Defendant CVS Pharmacy, Inc. from 2000 to 2001, and she was then rehired by

2

Defendant in April of 2003 as a pharmacy technician.  In March of 2004, Plaintiff was transferred to Defendant's Store 8128 in Dearborn, Michigan, and she became the lead pharmacy technician at this location in late 2007.  She remained in this position until Defendant terminated her employment on February 16, 2009.

On Wednesday, February 11, 2009, Store 8128 received a shipment of narcotic medications.  Under store policy, only pharmacists were permitted to handle narcotic medications, and pharmacy technicians (such as Plaintiff) were forbidden to do so. Plaintiff testified at her deposition that she was aware of this policy, and that, consistent with the policy, she did not touch the February 11 shipment.  Rather, she testified that she witnessed a pharmacist at the store, Runa Nuseibeh, log in this shipment — consisting of two bottles of methylphenidate and two bottles of morphine — and set it aside to be stored later in a designated, secure location.  (*See* Defendant's Motion, Ex. C, Plaintiff's Dep. at 82, 90-94; *see also* Defendant's Motion, Ex. F (showing Runa Nuseibeh's signature for narcotics shipment).)

The next day, February 12, 2009, the store's pharmacist-in-charge, Allie Mansour, was placing this shipment in a safe designated for narcotics when he noticed that the two bottles of methylphenidate and two bottles of morphine were missing.  Mansour spoke to Nuseibeh, who stated that she had witnessed Plaintiff "combining" the narcotics onto a single "tote" (*i.e.,* shipment container) during her shift the previous day.  (*See* Defendant's Motion, Ex. F, Mansour Decl. at ¶ 6; *see also* Defendant's Motion, Ex. H,

Nuseibeh Decl. at ¶ 5.)[1]  Mansour then reported the narcotics loss and Nuseibeh's statement to his supervisor.

On Friday, February 13, 2009, Store 8128's district manager, Bilal Bazzi, and Defendant's loss prevention regional manager, Fred Cahill, arrived at the store to investigate the missing narcotics.  As part of their investigation, they called Plaintiff into the manager's office for an interview that lasted from about 11:30 a.m. until 1:00 p.m. Although Plaintiff denied any involvement with the missing narcotics, she wrote and signed a statement in which she admitted that, over the course of her employment, she had stolen three Zyrtec allergy pills from the pharmacy and consumed 26 bottles of soda without paying for them.  (*See* Defendant's Motion, Ex. A, 2/13/2009 Statement.)  In this statement, Plaintiff acknowledged her awareness that theft violated company policy, and she stated that she had been treated fairly by Cahill and Bazzi during the interview.  (*See id.* at 2.)  Finally, in pre-printed language directly above her signature on each page of the statement, Plaintiff agreed that she had "offer[ed] this statement voluntarily" and had "not been threatened, coerced, or promised leniency by any agent of [Defendant] to compel [her] to submit this statement," and she affirmed that the statement was "true, to the best of [her] knowledge."  (*Id.* at 1, 2.)

In her deposition testimony, however, Plaintiff asserted that this statement was not truthful, and that she was misled and coerced into writing and signing it.  In particular,

---

[1]As noted above, Plaintiff has denied that she combined the narcotics onto a single tote (or that she even touched them).  (*See* Plaintiff's Dep. at 94, 104.)

4

Plaintiff testified that Fred Cahill charged her with stealing soda from the store, and that she denied this charge. (*See* Plaintiff's Dep. at 121-23.) Similarly, she testified that she told Cahill that she had not stolen the Zyrtec tablets, but that the store pharmacists instead had given her this medicine, just as they might occasionally offer one of these pills to a customer. (*See id.* at 132-33.)[2] Nonetheless, she testified that she agreed to write the false statements regarding the soda and Zyrtec because Cahill "wanted [her]" to write these statements — and, in fact, told her what to write — and because he promised that "as long as you admit to this, you'll go back to work and it'll be the end of this." (*Id.* at 132-35, 138-39, 143-44.) Plaintiff further testified that she did not read the pre-printed language in the statement regarding the absence of threats, coercion, or promises of leniency before she signed the statement, explaining that she was "too upset" to do so. (*See id.* at 148.)

Despite Cahill's purported assurance that Plaintiff could return to work once she completed and signed the statement, she was informed by district manager Bazzi at the conclusion of the February 13 interview that she was being suspended until the following Monday while Bazzi decided what action to take. (*See id.* at 189-90.) After consulting with Defendant's human resources department, Bazzi decided to terminate Plaintiff's employment, (*see* Defendant's Motion, Ex. G, Bazzi Dep. at 46-47), and store manager

---

[2]Plaintiff later gave somewhat conflicting testimony as to the Zyrtec tablets, stating that she did not tell Cahill that a pharmacist had given her these pills, either because she "was very upset" and "just wanted [the interview] to be over," or because she "did not want the pharmacist to get in trouble." (*Id.* at 192.)

5

Russ Lokuta called Plaintiff and notified her of this decision on Monday, February 16, 2009, (*see* Plaintiff's Dep. at 190).  This lawsuit followed, with Plaintiff alleging that her discharge and other adverse actions she purportedly suffered while employed by Defendant were the product of unlawful retaliation and/or discrimination on account of her gender, race, and religion, and that Defendant's agents committed the state-law torts of fraud and false imprisonment in the course of the February 13, 2009 interview that led to Plaintiff's discharge.

### III.  ANALYSIS

**A.     The Standards Governing Defendant's Motion**

Through the present motion, Defendant seeks summary judgment in its favor on each of Plaintiff's claims.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).[3]  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,*

---

[3]Effective December 1, 2010, Rule 56 has been revised in various respects, but the language quoted here (and below) reflects the Rule as it read when Defendant filed its present motion.  The recent revisions to the Rule do not materially alter the standards to be applied by the Court in the present case.

6

477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.    Plaintiff's Claim of Fraud Fails for Lack of Reasonable Reliance on Oral Assurances That Contradicted the Language of the Written Statement She Signed After Receiving These Alleged Assurances.**

In Count I of her complaint, Plaintiff asserts a state-law claim of fraud arising from the alleged conduct of district manager Bilal Bazzi and loss prevention regional manager Fred Cahill during their February 13, 2009 meeting with Plaintiff.[4]  In particular, Plaintiff

---

[4]Count I of Plaintiff's complaint is captioned "Fraud and Coercion."  As Defendant observes in its motion, however, coercion generally is viewed as a defense to a claim of contract formation or enforcement, *see, e.g., Rowady v. K Mart Corp.,* 170 Mich. App. 54, 428 N.W.2d 22, 24 (1988), and not a separate, affirmative cause of action.  While Plaintiff contests this point in her response to Defendant's motion, she has not identified any Michigan case law or other authority recognizing a cause of action for "coercion," much less identifying the elements of such a claim.  Accordingly, the Court construes Count I of the complaint as asserting only a

7

alleges (and has testified at her deposition) that Cahill assured her at this meeting that if she made and signed a statement admitting to theft of Zyrtec tablets and soda from Defendant's store, she could return to work and the matter would be considered resolved. Yet, despite these assurances, Plaintiff was suspended and then discharged after providing the statement requested by Cahill. In Plaintiff's view, these circumstances suffice to establish each of the elements of a Michigan common-law claim of fraud.

Although Defendant challenges this claim on multiple grounds, the Court finds it necessary to address only one of these challenges. As Defendant observes, among the elements of a fraud claim under Michigan law, a plaintiff must show reasonable reliance on the defendant's false representation. *See Novak v. Nationwide Mutual Insurance Co.,* 235 Mich. App. 675, 599 N.W.2d 546, 553-54 (1999); *Nieves v. Bell Industries, Inc.,* 204 Mich. App. 459, 517 N.W.2d 235, 238 (1994); *Chimko v. Shermeta,* No. 264845, 2006 WL 2060417, at *2-*3 (Mich. Ct. App. July 25, 2006).[5] Moreover, the courts have held

_____

claim of fraud.

[5] In her response to Defendant's motion, Plaintiff questions whether a showing of reasonable reliance is necessary to sustain a claim of fraud, noting that some Michigan court decisions have omitted this from their statements of the required elements of such a claim. *See, e.g., Hi-Way Motor Co. v. International Harvester Co.,* 398 Mich. 330, 247 N.W.2d 813, 816 (1976) *Webb v. First of Michigan Corp.,* 195 Mich. App. 470, 491 N.W.2d 851, 853 (1992). Yet, the Michigan Court of Appeals addressed this question at length in *Novak,* 599 N.W.2d at 553-54, concluding that the "reasonable reliance" standard was the "correct rule of law" in Michigan. *See also Chimko,* 2006 WL 2060417, at *3 ("Since *Novak,* this Court has reiterated that, to sustain a fraud claim, the party claiming fraud must reasonably rely on a material misrepresentation."). This Court is not at liberty to depart from this ruling by a Michigan appellate court on a question of Michigan law, absent persuasive grounds for believing that the Michigan Supreme Court would decide otherwise, *see Ziebart International Corp. v. CNA Insurance Cos.,* 78 F.3d 245, 250-51 (6th Cir. 1996), and Plaintiff has identified no such grounds

in a number of cases that a plaintiff's reliance on an oral statement cannot be deemed "reasonable" if this oral representation is "contradicted by a written contract between the parties or otherwise conflict[s] with a written document that is readily available to the plaintiff." *Chimko,* 2006 WL 2060417, at *3; *see also Novak,* 599 N.W.2d at 553; *Nieves,* 517 N.W.2d at 238 (explaining that "[t]here can be no fraud where a person has the means to determine that a representation is not true"); *Webb,* 491 N.W.2d at 853; *Schuler v. American Motors Sales Corp.,* 39 Mich. App. 276, 197 N.W.2d 493, 495 (1972) (holding that the plaintiff in that case could not "show a misrepresentation by ignoring a part of the information supplied him, and then later claim[ing] he was defrauded because he was not told of the facts which he chose to ignore"); *Aron Alan,* 240 F. App'x at 683 ("There can be no fraud where it is apparent that all the representations cannot simultaneously be true."); *Jackson v. Telegraph Chrysler Jeep, Inc.,* No. 07-10489, 2009 WL 928224, at *4-*5 (E.D. Mich. Mar. 31, 2009).

In this case, in the very statement Plaintiff claims she was defrauded, tricked, or coerced into signing, Plaintiff affixed her signature (at two different points) directly below language attesting and affirming that she had "not been threatened, coerced, or promised leniency by any agent of [Defendant] to compel me to submit this statement." (Defendant's Motion, Ex. A, 2/13/2009 Statement at 1, 2.) Beyond this signed statement,

---

here. Moreover, both this Court, *see Issa v. Provident Funding Group, Inc.,* No. 09-12595, 2010 WL 538298, at *5 (E.D. Mich. Feb. 10, 2010), and the Sixth Circuit, *see Aron Alan, LLC v. Tanfran, Inc.,* No. 06-2087, 240 F. App'x 678, 682 (6th Cir. June 25, 2007), have required that a plaintiff show reasonable reliance in order to sustain a claim of fraud under Michigan law. Thus, the Court readily concludes that such a showing must be made here.

Plaintiff also executed a promissory note in which she promised to repay Defendant for the property she had taken, affixing her signature just below language stating that "[t]his note is not given in exchange for any promise, express or implied, regarding either the status of my employment or any other action the company may take . . . , and is entered into by me voluntarily, without duress, and with my full knowledge and consent as to the terms herein." (Defendant's Motion, Ex. A, Promissory Note.)  Plainly, these written statements in the documents provided to and signed by Plaintiff directly contradicted the oral assurances Plaintiff purportedly was given by Cahill — namely, that Plaintiff could return to work, and that the matter would be considered resolved, if she would sign a statement admitting to theft of company property.  Likewise, Cahill's alleged invitation for Plaintiff to lie in her written statement, by admitting to thefts of company property in which she had not engaged, stands in direct contrast to the language of the statement itself attesting that the statement was "true, to the best of [Plaintiff's] knowledge." (2/13/2009 Statement at 1, 2.)  Finally, and more generally, Cahill's purported assurance that Plaintiff could admit to theft of company property with no consequence to her employment status ran counter to a passage in Defendant's employee handbook stating that "unauthorized use, possession, or taking of the company's or another person's property" was grounds for discharge. (*See* Defendant's Motion, Ex. D, "Your Guide to CVS" Handbook at 14-15.)[6]

---

[6]Along the same lines, Plaintiff testified at her deposition that she was aware of Defendant's policy that employees must pay for any food or drink obtained from the store before

10

Based on all of this information in documents that were either directly in front of Plaintiff at the time of Cahill's alleged misrepresentations or readily available to her, the Court finds as a matter of law that Plaintiff could not have reasonably relied on Cahill's oral assurances that she could return to work and retain her job if she admitted to theft of company property. Indeed, in her response to Defendant's motion, Plaintiff makes no effort to explain how this requirement of reasonable reliance could be satisfied under the present record, but instead contends only that Michigan law imposes no such requirement. Because the Court has determined otherwise — in accordance, as explained, with the great weight of Michigan case law, as well as the prior rulings of the Sixth Circuit and this Court — and because the evidence produced by Plaintiff is inadequate as a matter of law to meet this requirement, the Court finds that Defendant is entitled to summary judgment in its favor on Plaintiff's claim of fraud.

## C.   Plaintiff's Claim of False Imprisonment Fails for Lack of Evidence That She Was Unlawfully Restrained.

In Count II of her complaint, Plaintiff alleges that she was falsely imprisoned when Defendant's representatives, Cahill and Bazzi, "pinned [her] in a tiny office" and "interrogated" her about suspected theft of company property. (Complaint at ¶ 58.) In seeking summary judgment in its favor on this claim, Defendant argues that Plaintiff has failed to produce evidence that could establish either element of a claim of false imprisonment — namely, confinement and lack of probable cause. The Court agrees with

----

they consumed it. (*See* Plaintiff's Dep. at 58.)

11

the first of these contentions, and therefore need not reach the second.

Under Michigan law, false imprisonment entails "the unlawful restraint of a person's liberty or freedom of movement." *Tumbarella v. Kroger Co.,* 85 Mich. App. 482, 271 N.W.2d 284, 287 (1978). The Michigan courts have emphasized that there is no false imprisonment "where the plaintiff has not been arrested; and while . . . manual seizure is not necessary, there must be that, or its equivalent, in some sort of personal coercion." *Tumbarella,* 271 N.W.2d at 287 (quoting *Hill v. Taylor,* 50 Mich. 549, 15 N.W. 899, 900 (1883)). Thus, for example, a claim of false imprisonment cannot be sustained "if the plaintiff voluntarily agrees to stay with the defendant." *Clarke v. K Mart Corp.,* 197 Mich. App. 541, 495 N.W.2d 820, 823 (1993).

The record in this case fails as a matter of law to establish the requisite "arrest[] . . . or its equivalent" that could sustain a claim of false imprisonment. It is undisputed that Plaintiff voluntarily accompanied Cahill and Bazzi into the manager's office, evidently in response to a page calling her to meet with the two men. (*See* Plaintiff's Dep. at 107, 115.) Plaintiff further testified that the door to the office remained open throughout her meeting with Cahill and Bazzi, and that, in fact, "[t]here wasn't enough room [in the office] to close the door." (*Id.* at 108.) Although Plaintiff has alleged in her complaint (and testified at her deposition) that she was "pinned" in the office, she acknowledged at her deposition that Cahill and Bazzi were "big people," and that there was not "enough room to get up" with her and the two men in the small manager's office. (*Id.* at 140.) In addition, Plaintiff testified that Cahill and Bazzi remained seated during the meeting,

12

never raised their voices, never touched or threatened to touch her, never told her that she could not leave the room, and never took any affirmative steps to prevent her from getting up and leaving the room.  (*See id.* at 139-40, 156-59.)  Based on Plaintiff's own testimony, then, the record lacks any evidence of an "arrest" or coercive detention that could support a claim of false imprisonment.

In her response to Defendant's motion, however, Plaintiff suggests that Cahill "implied" during the meeting that she was not free to leave, in light of his purported assurance that she ***could*** leave and return to work if she admitted to theft of company property.  (*See* Plaintiff's Response Br. at 4.)  Yet, Plaintiff's own subjective belief that she was being detained cannot suffice, standing alone, to establish an "arrest[] . . . or its equivalent," absent evidence that Defendant's representatives took some sort of action that could be viewed as "proof of an intention to take the person accosted into custody." *Bonkowski v. Arlan's Department Store,* 383 Mich. 90, 174 N.W.2d 765, 767 (1970). Here, there is simply no evidence of a show of force, verbal threats, or any comparable affirmative conduct by Cahill or Bazzi that would take their meeting with Plaintiff out of the realm of a voluntary management/employee conference addressing allegations of theft of company property, and would instead transform this meeting into a custodial interrogation from which Plaintiff was not free to leave.  Accordingly, the Court finds that Plaintiff has failed as a matter of law to produce evidence of detention that would support a claim of false imprisonment.

This claim also fails for lack of evidence of "unlawful" restraint.  *See Tumbarella,*

13

271 N.W.2d at 287.  As Plaintiff conceded at her deposition, her employer was entitled to investigate allegations of theft of company property.  (Plaintiff's Dep. at 105.)  Plaintiff further acknowledged that it was reasonable for Defendant's representatives to question her about these allegations, in light of the statement by pharmacist Runa Nuseibeh that she had witnessed Plaintiff combining a shipment of narcotics onto a single tote, and in light of the subsequent discovery that these narcotics were missing.  (*See id.* at 105-06.)  In addition, Defendant points to language in its company handbook requiring employees to cooperate in such investigations.  (*See* Defendant's Motion, Ex. D, "Your Guide to CVS" Handbook at 15.)  Under comparable circumstances, the courts have held that an employer does not "unlawfully" confine its employee by compelling the employee to answer questions about a suspected violation of company rules.  *See, e.g., Moore v. City of Detroit,* 252 Mich. App. 384, 652 N.W.2d 688, 691 (2002); *Maturen v. Lowe's Home Centers, Inc.,* No. 06-15126, 2007 WL 3173962, at *10 (E.D. Mich. Oct. 26, 2007); *see also Harrison v. Oakland County,* 612 F. Supp.2d 848, 868 (E.D. Mich. 2009) (awarding summary judgment to the defendant employer on a Fourth Amendment claim of false arrest, where the plaintiff employee conceded that he was required to attend an investigative interview as "part of his job").  This, then, provides an additional basis for awarding summary judgment in Defendant's favor on Plaintiff's claim of false imprisonment.

**D.     Plaintiff Has Failed to Establish a *Prima Facie* Case of Discrimination Based on Her Race, Gender, or Religion.**

14

In Counts III through V of her complaint, Plaintiff has asserted claims of race, gender, and religious discrimination under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 *et seq.* Through the present motion, Defendant seeks summary judgment in its favor on each of these claims, arguing that Plaintiff has failed to establish a *prima facie* case of any of these forms of discrimination. The Court agrees.

To establish a *prima facie* case of discrimination under the ELCRA, Plaintiff must show (i) that she is a member of a protected class, (ii) that she was subject to an adverse employment decision, (iii) that she was qualified for the position, and (iv) that she was discharged or otherwise adversely treated "under circumstances that give rise to an inference of unlawful discrimination." *Lytle v. Malady,* 458 Mich. 153, 579 N.W.2d 906, 914 (1998) (footnote omitted); *see also Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, 568 N.W.2d 64, 68 (1997); *Minnis v. McDonnell Douglas Technical Services Co.,* 162 F. Supp.2d 718, 733 (E.D. Mich. 2001). One of the principal "purpose[s] of the prima facie test is . . . to remove the most common nondiscriminatory reasons for the employer's action, such as poor employee performance." *Town,* 568 N.W.2d at 68 (footnote with citation omitted). Ultimately, beyond establishing the elements of this *prima facie* case, Plaintiff has "the burden of producing evidence, whether direct or circumstantial, that proves that discrimination was a determining factor in the employer's decision." 568 N.W.2d at 69.

Clearly, Plaintiff's termination qualifies as an adverse action, and the Court

15

assumes for present purposes that she has satisfied the first (membership in protected

class) and third (qualified) elements of her *prima facie* case.  Thus, with respect to the

adverse action of termination, Plaintiff must show that she "was discharged under

circumstances that give rise to an inference of unlawful discrimination."  *Lytle,* 579

N.W.2d at 914 (footnote omitted).  As one effort to give rise to the requisite inference,

Plaintiff suggests that she "was, in part, replaced by" Lobna Bazzi, who Plaintiff claims is

a cousin of district manager Bilal Bazzi.  (*See* Plaintiff's Response Br. at 6.)

This theory of "replacement" fails on a number of grounds.  First, it cannot support

a claim of gender discrimination, as Plaintiff and her "replacement," Lobna Bazzi, both

are female.  In addition, while Plaintiff claims that Ms. Bazzi "replaced" her by taking

over some or all of her hours after her discharge, (*see* Plaintiff's Dep. at 237), Plaintiff

does not suggest a basis for her personal knowledge on this point, and she and her counsel

have otherwise failed to identify any record support whatsoever for this proposition.[7]  In

any event, even assuming that Ms. Bazzi assumed some or all of Plaintiff's hours

following her discharge, the Sixth Circuit and the Michigan courts have held that

"[s]preading the former duties of a terminated employee among the remaining employees

does not constitute replacement."  *Lilley v. BTM Corp.,* 958 F.2d 746, 752 (6th Cir.

---

[7]If, in fact, Ms. Bazzi assumed some of Plaintiff's hours following her termination, she
evidently did so only reluctantly and temporarily.  In an affidavit accompanying Defendant's
motion, Ms. Bazzi states that she "did not desire to work more hours" during this period because
she was attending school and planning to get married, and she further states that she left
Defendant's employ in May of 2009, roughly three months after Plaintiff's discharge.  (*See*
Defendant's Motion, Ex. N., Lobna Bazzi Decl. at ¶ 9.)

1992); *see also Grosjean v. First Energy Corp.,* 349 F.3d 332, 335-36 (6th Cir. 2003);

*Tremblay v. Swoboda, Inc.,* No. 231042, 2002 WL 31082167, at *2 (Mich. Ct. App. Sept.

17, 2002).  Accordingly, no inference of unlawful discrimination arises from Plaintiff's

allegation that Ms. Bazzi took over her hours after her termination.

　　　Plaintiff's remaining efforts to support such an inference of discrimination in her

discharge rest wholly upon her own subjective views and unfounded speculation.[8]  She

testified, for example, that district manager Bilal Bazzi "does not like females in charge,"

explaining that she arrived at this conclusion because when she initially introduced

herself to Bazzi and identified herself as the lead pharmacy technician, Bazzi responded

by saying "'Oh,' like as if it's a big disappointment." (Plaintiff's Dep. at 160.) Plaintiff

further testified that she "heard through other technicians" that Bazzi "had a whim on

firing anybody he doesn't like," and she speculated that Bazzi fired her because he

---

[8]What is more, Plaintiff's presentation of her subjective and speculative views in her response brief is almost entirely unsupported by citation to the record.  Throughout her entire discussion of her claims of discrimination, she cites only a single page of her deposition, and then makes reference at two points to the deposition of a former co-worker, Carol Wall, without directing the Court's attention to particular passages in Ms. Wall's deposition that might support the factual assertions at issue.  (*See* Plaintiff's Response Br. at 5-6.)  Moreover, this defect is not remedied by Plaintiff's recitation of the pertinent facts in an earlier portion of her brief, because this statement of facts includes a grand total of ***three citations*** to passages from her deposition testimony. (*See id.* at 1-3.)  "Nothing in either the [Federal] Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record."  *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir. 1992).  To the contrary, it would be "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party:  seeking out facts, developing legal theories, and finding ways to defeat the motion."  *Guarino,* 980 F.2d at 406.  On this ground alone, then, Defendant's request for summary judgment in its favor on Plaintiff's claims of discrimination could be granted as essentially unopposed.

17

"wanted to have his family" or "his kind of people" at the pharmacy. (*Id.* at 161, 237, 239.) These sorts of "[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference" of unlawful discrimination. *Chappell v. GTE Products Corp.,* 803 F.2d 261, 268 (6th Cir. 1986).[9]  Consequently, the Court finds that Plaintiff has failed to establish the fourth prong of her *prima facie* case of discriminatory discharge.[10]

Apart from her discharge, Plaintiff appears to complain that she was the victim of unlawful discrimination in other aspects of her employment with Defendant. She testified, for instance, that her Arabic co-workers "were allowed to go pray three times a day" during the workday, while Defendant never extended the same offer to her. (Plaintiff's Dep. at 252-53.) Yet, Plaintiff concedes that she never asked for a religious prayer break, (*see id.* at 262-63), and Defendant correctly observes that the grant of such a

_____

[9]In addition, to the extent that Plaintiff offers her personal belief that Bilal Bazzi showed favoritism toward his relatives, Defendant correctly observes that such charges of nepotism, even if proven, cannot sustain a claim of unlawful discrimination. *See Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1096 (6th Cir. 1996); *Wojcik v. McNish,* No. 267005, 2006 WL 2061499, at *11 (Mich. Ct. App. July 25, 2006). Similarly, to the extent that Plaintiff asserts that Bazzi was motivated by personal animus toward her, this does not give rise to an inference of unlawful discrimination. *See Nizami v. Pfizer Inc.,* 107 F. Supp.2d 791, 805 n.15 (E.D. Mich. 2000).

[10]As an alternative basis for this conclusion, Defendant suggests that Plaintiff's claim of discriminatory discharge fails for lack of evidence that any similarly situated employee outside the pertinent protected classes engaged in theft of company property but was not terminated. This argument, however, rests upon a disputed premise — namely, that Plaintiff committed the thefts to which she admitted in her written statement. Plaintiff has testified that she did not, and that she admitted to these thefts only because Cahill urged her to do so. If Plaintiff's testimony on this point is credited, district manager Bazzi could not have fired Plaintiff on the basis of a sincere belief that she had admitted to theft of company property, because Bazzi was present at the meeting at which Cahill purportedly extracted confessions from Plaintiff that he knew were false. This factual dispute, then, defeats Defendant's appeal to Plaintiff's alleged theft of company property as a nondiscriminatory basis for her termination.

18

religious accommodation to a co-worker does not establish unlawful discrimination against employees who neither need nor request such an accommodation.  *See Draper v. United States Pipe & Foundry Co.,* 527 F.2d 515, 520 (6th Cir. 1976).  Next, while Plaintiff complains that her employer discriminated on the basis of religion or ethnicity in the grant or denial of lunch and bathroom breaks, (*see* Plaintiff's Dep. at 252-53, 259-66), Defendant points out that such alleged discrimination in the allocation of breaks does not rise to the level of an "adverse employment action" that would establish the second prong of a *prima facie* case of discrimination.  *See Johnson v. United Parcel Service, Inc.,* No. 03-5620, 117 F. App'x 444, 450 (6th Cir. Dec. 21, 2004) ("Case law indicates that, absent changes in salary or the number of hours of work, scheduling matters would not normally classify as potential adverse employment actions."); *see also Chen v. Wayne State University,* 284 Mich. App. 172, 771 N.W.2d 820, 839 (2009) (holding that to qualify as "adverse," an "employment action must be materially adverse to the employee — that is, it must be more than a mere inconvenience or minor alteration of job responsibilities").  Accordingly, Plaintiff's claim of discrimination in the conditions of her employment, like her claim of discriminatory discharge, fails for lack of a *prima facie* showing of unlawful discrimination.

**E.**     **Plaintiff Has Failed to Establish a *Prima Facie* Case of Retaliatory Discharge.**

Finally, in Count VI of her complaint, Plaintiff alleges that she was discharged in retaliation against her complaints about her co-workers and about discriminatory treatment in the course of her employment.  In seeking summary judgment in its favor on

19

this claim, Defendant contends that Plaintiff has failed to establish three of the four

elements of a *prima facie* case of retaliation.  The Court agrees.

To establish a *prima facie* case of retaliation under the ELCRA, Plaintiff must

show (i) that she engaged in protected activity, (ii) that Defendant had knowledge of this

protected activity, (iii) that Defendant took an adverse employment action against her,

and (iv) that there was a causal connection between her protected activity and the adverse

employment action.  *Barrett v. Kirtland Community College,* 245 Mich. App. 306, 628

N.W.2d 63, 70 (2001).  With regard to the first, "protected activity" prong of this

standard, Plaintiff cites her complaints about (i) Mohamed Bazzy, a former pharmacist-in-

charge at Store 8128, (ii) Kamal Hachem, a former lead pharmacy technician at the store,

and (iii) a pharmacist named "Majeev" who worked at the store several years prior to

Plaintiff's discharge.  (*See* Plaintiff's Dep. at 195-200, 209-23.)  As to Plaintiff's

complaints about Bazzy, however, she testified that she did not complain that he was

discriminating against her on the basis of her race, gender, or religion, but that she instead

protested against Bazzy's scheduling practices.  (*See id.* at 208-09.)  As Defendant

observes, a complaint must be directed at conduct prohibited by the ELCRA in order to

qualify as "protected activity" under the statute's anti-retaliation provision.  *See Johnson

v. Honeywell Information Systems, Inc.,* 955 F.2d 409, 415-16 (6th Cir. 1992), *abrogated

on other grounds by McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352 (1995);

*Johnson v. General Motors Corp.,* No. 190340, 1997 WL 3334954, at *4 (Mich. Ct. App.

Sept. 12, 1997).

Next, Plaintiff has utterly failed to show that the individual who made the decision to discharge her, district manager Bilal Bazzi, was aware that she had engaged in any protected activity.  When expressly asked at her deposition whether Bazzi knew of her complaints against Mohamed Bazzy, Kamal Hachem, or "Majeev," Plaintiff acknowledged that she had no evidence of any such knowledge or awareness.  (*See* Plaintiff's Dep. at 208, 215, 223.)  Rather, Plaintiff merely speculated that Bazzi likely knew of these complaints because, for example, Bazzi and Mohamed Bazzy purportedly were "related and they probably do talk with each other," and because Bazzi "had access to my files."  (*Id.* at 208, 223.)  Such speculation plainly does not suffice to establish the "knowledge" prong of a *prima facie* case of retaliation.

Finally, Plaintiff has failed to produce any evidence of a causal connection between her protected activity and her discharge.  Her testimony on this point, once again, consists of nothing more than idle speculation, (*see id.* at 203, 215), and the passage of eighteen months or more between her most recent complaints of mistreatment or discrimination and her discharge tends to undermine, rather than support, any notion that there was a causal connection between the two.  Consequently, Plaintiff has failed to establish a *prima facie* case of retaliatory discharge.[11]

---

[11]For what it is worth, even accepting that Plaintiff engaged in the thefts of company property to which she admitted in her signed statement, discharge would appear to be a fairly draconian penalty to impose upon a worker who, in her several years of employment, took a few allergy pills and consumed several bottles of soda without paying for them.  Yet, absent evidence that Defendant took this severe action for reasons deemed impermissible under the ELCRA, this Court is powerless to second-guess Defendant's business judgment as to whether even *de minimis* thefts of company property warrant termination.

## IV.  **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's April 30,

2010 motion for summary judgment (docket #29) is GRANTED.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 14, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 14, 2011, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager

22